### In re HARVARD INDUSTRIES, INC., et al., Debtors.

#### No. 02–50586.

United States Bankruptcy Court, D. New Jersey.

Feb. 28, 2005.

Adam G. Brief, Wollmuth Maher & Deutsch LLP, Trenton, NJ, for debtors.

Laurence P. Blaskopf, Department of Justice, Washington, DC, for I.R.S.

KATHRYN C. FERGUSON, Bankruptcy Judge.

On February 22, 2005, the court heard oral argument on motions for summary judgment by the Internal Revenue Service and Harvard Secured Creditors Liquidation Trust. The court denied summary judgment on the issue of the workers' compensation payments pending additional discovery by the parties, and reserved decision on the remaining issues.

This matter has a long history. In June 2003, the Debtors filed a motion styled "Motion Requesting a Determination as to Debtors' Rights to a Tax Refund Pursuant to 11 U.S.C. § 505" ("tax refund motion"). In September 2003, the Debtors amended the tax refund motion to clarify certain statements made in the original motion. Prior to the resolution of the tax refund motion, the Debtors confirmed their Chapter 11 plan. Pursuant to the Plan, certain assets and causes of action were assigned to various trusts that were to established under the Plan. As a result, the Harvard Secured Creditors Liquidation Trust ("Trust") is now the party in interest on this motion.

At a hearing on September 3, 2003, this court determined that the most prudent course of action was to treat this motion as a contested matter under Fed. R. Bankr. Pro. 9014 and to set it down for a pre-trial. After numerous adjournments by the parties, a pre-trial was held on January 4, 2005, and an order was entered that required all motions to be filed by February 2, 2005. These two summary judgment motions ensued. The parties also filed opposition to each other's summary judgment motions.

The Supreme Court has established that summary judgment is appropriate only when there is no genuine issue of material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c). The party moving for summary judgment has the burden of establishing the nonexistence of any "genuine issues of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When as is the case here, the court is presented with cross-motions for summary judgment, the court is to draw all reasonable inferences in favor of the party opposing the particular motion. *Buttitta v. City of Chicago*, 803 F.Supp. 213 (N.D.Ill.1992), *aff'd*, 9 F.3d 1198 (7th Cir.1993).

The court agrees with the Trust that the IRS's motion for summary judgment is procedurally defective because it did not contain a Rule 56 statement and was not supported by admissible evidence. *Hoch v. Phelan*, 796 F.Supp. 130, 131 (D.N.J. 1992) (inclusion of a statement pursuant to D. N.J. Local Rule 56.1 is a vital procedural step and summary judgment cannot be granted without it); *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (to prove its case party must "go beyond the pleadings" and use affidavits, answers to interrogatories, *etc.*) However, since the court finds that it can rule in favor of the Trust on its motion for summary judgment, those deficiencies are immaterial.

The issues presented by these summary judgment motions are whether three different categories of payments by Harvard constitute specified liability losses under 26 U.S.C. § 172(f). The payments are: 1) amounts Harvard expended in 1996 to settle claims relating to aircraft parts manufactured by its ESNA division; 2) amounts Harvard contributed to its pension plans as part of a settlement with the PBGC; and 3) certain workers' compensation payments. The court denied summary judg-

ment as to the workers' compensation payments at the conclusion of oral argument.

### Products liability claim

 The starting point for analyzing any statute has to be the language itself. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) If that language is clear there is no need for further inquiry. *Id.* at 241, 109 S.Ct. 1026. Section 172(f)(4) provides that "product liability" means, among other things, "liability of the taxpayer for damages on account of ... loss of the use of property." It is that part of the statute that the IRS appears to ignore. The IRS focuses on the fact that no injury to persons or property resulted from the use of the parts. That limited focus is misplaced given that the plain language of the statute clearly provides that product liability also includes damages from loss of the use of property. Since the term "property" is not defined in the statute, the court must *accord* it its ordinary meaning. *In re Fegeley*, 118 F.3d 979 (3d Cir.1997). Under its ordinary meaning "property" would include the Lock–Nuts at issue here. Had the statute been intended to be limited to property other than the defective property at issue, the drafters could have easily done that by inserting the word "other" before property. They did not do so, thus, the court must interpret the statute as written and conclude that "loss of the use of property" includes the property that was defective.

Loss of the use of the defective property is precisely what occurred here. Harvard's customers were distributors who were unable to use the Lock–Nuts manufactured by ESNA because of a defect known as hydrogen embrittlement. Here again, the court gives the term "use" its plain meaning which would include intended use as an item to resell. As a result of the customers loss of use of the defective Lock–Nuts, ESNA entered into settlements with the customers to forgive their accounts receivables. In addition, ESNA made a payment of $820,000 to its largest customer, Harco, on account of a lawsuit brought regarding the defective parts. That payment and the forgiveness of the accounts receivables all amount to damages as a result of loss of the use of property, therefore, they fit within § 172(f)(4)'s definition of product liability. The IRS's strained reasoning that ESNA's customers could not have lost the use of the property because they never had the use of the property because it was defective in its manufacture is unpersuasive and does not fit with a common sense reading of the statute.

 To bolster its argument that these payments do not qualify as product liability losses, the IRS turns to Treasury Regulation § 1.172–13(b)(2)(ii), which states that "[t]he term product liability does not include liabilities arising under warranty theories relating to repair or replacement of the property that are essentially contract liabilities." That regulation is an imperfect fit because the payments at issue here were not for repair or replacement. Regardless, reliance on that regulation is complicated because of the inherent tension between tort law and contract law in the product liability area. *See, e.g.,* Marshall S. Shapiro, *In Search of the Law of Products Liability: The ALI Restatement Project,* 48 Vand. L.Rev. 631 (1995). At oral argument, the IRS cited the court to *Aloe Coal Co. v. Clark Equipment Co.,* 816 F.2d 110 (3d Cir.1987) for the proposition that the Third Circuit has cited the *East River* case approvingly. In *East River* the Supreme Court set forth what is commonly referred to as the economic loss rule. *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106

S.Ct. 2295, 90 L.Ed.2d 865 (1986). The fact that the Third Circuit may have espoused the economic loss rule in certain instances is not dispositive of the issue before this court. This court is unaware of any Third Circuit Court of Appeals case that addresses the meaning of the phrase "loss of the use of property" in § 172(f)(4). That is significant because the line between strict product liability in tort and warranty liability under the UCC is continuing to evolve. *See,* Thomas C. Galligan, *Contortions Along the Boundary Between Contracts and Torts,* 69 Tul. L.Rev. 457 (1994). Accordingly, the court is not persuaded that the cited Treasury Regulation precludes a finding that the losses at issue were product liability losses. More importantly, the court has already found that the plain language of § 172(f)(4) includes loss of the use of the defective property itself and a regulation cannot alter the terms of a statute. *See, e.g., Atlantic City Elec. Co. v. F.E.R.C.,* 295 F.3d 1 (Fed.Cir.2002) (a federal agency "may not rely on its own regulations to trump the plain meaning of a statute.")

The court also finds that Harvard's failure to make a claim against its product liability policy on account of this loss is a red herring and has no bearing on the court's determination. The court will grant summary judgment in favor of the Trust on the legal issue of the product liability losses qualifying as specified liability losses that may be carried back under 26 U.S.C. § 172(f)(1)(A).

### Pension contribution claim

The version of 26 U.S.C. § 172(f)(1)(B) in existence in 1996 provided that the payment of certain liabilities that arose under federal or state law could qualify as specified liability losses and be carried back and deducted 10 years earlier than when the payment was made. The term "specified liability loss" was defined as:

the sum of the following amounts to the extent taken into account in computing net operating loss for the taxable year:

\* \* \* \* \* \*

(B) Any amount (not described in subparagraph (A)) allowable as a deduction under this chapter with respect to a liability which arises under a Federal or State law or out of any tort of the taxpayer if—

(i) in the case of a liability arising out of a Federal or State law, the act (or failure to act) giving rise to such liability occurs at least 3 years before the beginning of such taxable year ....

Application of this statute involves resolving two issues: did the liability at issue arise out of a federal or state law, and did the liability occur at least 3 years before the tax year at issue. The answer to both questions is yes.

█ The court finds that Harvard's payment to its pension plans arose under ERISA. In arguing that the payments did not arise under federal law, the IRS focuses on the fact that Harvard had satisfied its minimum funding requirements under section 412 of the IRC. That argument ignores the fact that those are not the only payment obligations under ERISA. Additional funding requirements may be triggered by a plan's unfunded current liability. *See,* 26 U.S.C. § 1082(d)(8); 29 U.S.C. § 412(1)(8). That was the case here because the PBGC had determined that Harvard had unfunded current liabilities in the tax years 1992 and 1993. It is certainly true that Harvard's settlement with the PBGC on that issue was motivated by its desire to issue senior notes to fund its plan of reorganization without objection from the PBGC, but that does not change the ultimate fact that the plans had unfunded liabilities in 1992 and 1993. Thus, to main-

tain its qualified status Harvard was required by law to make those payments.

■ That, of course, leads to the IRS's other argument: that the need for additional contributions to the pension plans arose out of a choice made by Harvard to maintain qualified pension plans for its employees. In a recent decision on this issue the Federal Circuit Court of Appeals stated that "the nature and amount of the liability must be traceable to a specific law and cannot be the result of choices made by the taxpayer or others." *Major Paint Co. v. United States,* 334 F.3d 1042 (Fed. Cir.2003). While that decision is interesting, it does not instruct a court on where it must draw the line regarding what constitutes a choice made by a taxpayer. At some level everything involves a choice. It is frequently recognized that liability for workers' compensation claims may qualify for specified liability loss status, *Host Marriott v. United States,* 113 F.Supp.2d 790 (D.Md.2000), *aff'd* 267 F.3d 363 (4th Cir.2001), yet that liability only arises because an employer makes the decision to hire workers who are covered by that law. A similarly slippery slope is apparent here. While it is certainly true that offering an ERISA qualified pension plan to its employees was a voluntary business decision by Harvard, the court finds that the more prudent interpretation would be to find that once a decision like that is made then Harvard was bound by all of ERISA's regulations. Thus, complying with ERISA's funding requirements was not a voluntary decision on the part of Harvard, it was required by federal law.

■ The next issue is whether the liability arose within three years prior to the beginning of the taxable year at issue. The IRS takes the position that the final act fixing Harvard's liability occurred on July 26, 1994, the date Harvard entered into its agreement with the PBGC. The court finds that argument to be misplaced. The agreement with the PBGC did nothing to create Harvard's liability, it was merely the settlement of how that liability would be paid. The liability itself was created in tax years 1992 and 1993 due to Harvard's reliance on inaccurate actuarial assumptions. *See,* White aff'd, at ¶ 17. Therefore, the court finds that the liability arose more than three years prior to the relevant tax year. Accordingly, the court will grant summary judgment in favor of Harvard on the issue of its pension plan payments qualifying as specified liability losses.

The Trust should submit a form of order in accordance with this opinion.